Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5676 | **DATE** | 9/24/2004 |
| **CASE TITLE** | | Carter vs. IDOC | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Order. Defendants' motion for summary judgment [8-1] is granted. Defendants' motion to strike [18-1] is denied as moot. Case Terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 28 2004 | |
| | Notified counsel by telephone. | | date docketed | 22 |
| X | Docketing to mail notices. | | | |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RJ/TL | courtroom deputy's initials | 2004 SEP 23 AM 5:06 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARRYL CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 5676 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS and CHUCK GOBBLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Darryl Carter has sued his employer, the Illinois Department of Corrections (the "IDOC"), and his supervisor, Superintendent Chuck Gobble, under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981, alleging that he was discriminated against on the basis of race. Specifically, Carter alleges that Gobble, who is white, subjected him to a racially hostile work environment. Defendants have moved for summary judgment, arguing that the undisputed facts establish as a matter of law that (1) the alleged harassment was not severe or pervasive enough to be actionable, (2) Gobble's actions were not racially motivated, and (3) the IDOC cannot be held liable for Gobble's actions because it provided an effective mechanism to prevent and correct discrimination and Carter unreasonably failed to take advantage of the IDOC's remedial mechanism. For the reasons stated below, defendants' motion for summary judgment is granted.

## BACKGROUND

Carter, who is African-American, is a correctional officer at the IDOC's Stateville Correctional Center ("Stateville") in Joliet, Illinois. In March of 1991, Carter was promoted to his current rank of lieutenant. In that position Carter is responsible for the safety and sanitation of his

-1-

unit, addressing inmate issues, supervising inmate movements, running inmate showers, ensuring inmate compliance with property rules, reporting unusual incidents, supervising lower-ranked officers, and carrying out orders given to him by superior officers.

Carter alleges that he became the target of racial harassment once Chuck Gobble became his supervisor. Gobble was promoted to the rank of superintendent and transferred to Stateville around August 2001. As part of his duties, Gobble supervised two shifts that patrolled Stateville's "B and C Houses" – Carter's shift, which worked from 7:00 a.m. to 3:00 p.m., and a later shift that worked from 3:00 p.m. to 11:00 p.m. Both shifts included African-American correctional officers and supervisory staff. All of the supervisory officers for Carter's shift were African-American. Although Carter sometimes refers to the 3-11 shift as the "all white" shift, it is undisputed that the supervisory staff of the 3-11 shift included two white officers, one Asian-American officer and one African-American officer.[1]

Carter alleges that Gobble was disrespectful and demeaning to Carter and other African-American staff members. He alleges that he was "disrespected" on an almost daily basis and that nothing changed after Carter confronted Gobbles about the disrespectful treatment, nor after he complained to the IDOC's Affirmative Action Officer.[2] Carter requested a transfer from Gobble's supervision, but Stateville's warden, Ken Briley, refused Carter's request.

---

[1] It is undisputed that the non-supervisory staff of both shifts included African-American correctional officers. However, neither Gobble nor Carter provide evidence of the precise racial makeup of the two shifts. Overall, as of January 31, 2002, the vast majority of correctional officers at Stateville, at both higher and lower ranks, were African-American.

[2] The IDOC's Affirmative Action Office Administrator is responsible for an IDOC anti-discrimination program. This administrator is responsible for educating staff about anti-discrimination policies and for taking complaints of discrimination and harassment. The IDOC posts in each facility an EEOC poster and a copy of the IDOC Affirmative Action Policy Statement that sets forth reporting procedures for discrimination and harassment. It is undisputed that the IDOC also provides each employee with a copy of this policy.

Although Carter alleges that he was repeatedly harassed, he points to only three specific incidents in support of his claims of racial harassment:

First, Carter claims that on January 2, 2002, Gobble used a demeaning tone of voice when issuing a command over the radio directed to Carter and another officer in Carter's shift. That incident arose out of Warden Briley's January 1, 2002 surprise search of the cells in B and C Houses. Briley conducted the search to root out any violations of Stateville's rules regarding prisoners' personal property. The Warden discovered property violations in both houses and informed Gobble of the deficiency. Apparently seeking an immediate correction, Warden Briley conducted a second surprise compliance check the next day, January 2. When Gobble learned of Briley's second compliance check, he radioed Carter and another officer on duty to notify them. In that radio transmission Gobble warned Carter and another officer that "[t]here better not be any issues and I'm not going to take this for a second day in a row." Carter took offense at Gobble's warning and, on January 3, 2002, filed a written complaint alleging that Gobble's behavior was discriminatory. Carter had not previously lodged any complaints of discriminatory conduct by Gobble. In a January 11, 2002, response to Carter's incident report, the IDOC Affirmative Action Office found that Gobble's radio message did not violate the IDOC's anti-discrimination policies.

Second, Carter claims that, on March 5, 2002, his shift was required to perform duties that should have been performed by the "all white" 3-11 shift. While the job descriptions of each shift require running prisoner showers and conducting prisoner shakedowns, traditionally Carter's shift performed the shakedowns, while the evening shift supervised the showers. On March 5, 2002, however, Gobble ordered Carter's shift to perform both tasks. Carter felt that those additional duties were given to his shift because the 3-11 shift was "all white." Carter filed a complaint in response to this incident on March 6. In a memorandum dated March 15, 2002, Warden Briley concluded that

Carter's allegation of bias was without support.

Third, Carter claims that Gobble monitored his activities too closely and "stood over his shoulder" to make sure that tasks were completed. The only specific example cited by Carter is that in March of 2002, Gobble instructed Carter to make phone calls to obtain information regarding a hospitalized inmate. After doing so, Carter was instructed by Gobble to call for the information again. Carter alleges that the second call was clearly unnecessary and, therefore, harassment. As for other incidents of ongoing demeaning comments and unequal treatment, Carter provides no specifics except to say that he was spoken to "like a child" and that, when he was given assignments by Gobble, "within minutes" Gobble would "be standing over him" to see that the task was completed.

It is undisputed that Gobble was a hands-on manager: Gobble followed up with all officers regardless of their race or gender to confirm that tasks were completed. It is also undisputed that Gobble has never used a racial slur or other racially derogatory language in Carter's presence. Since the events alleged in the complaint, Carter has not had his pay or benefits reduced, and has not been transferred, demoted, suspended or disciplined. His duties and responsibilities have not changed during that period.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991). The party opposing

summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

Carter claims that he was subjected to a racially hostile work environment in violation of Title VII and Section 1981. To prevail on that claim, Carter must show, *inter alia*, that: 1) he was subject to unwelcome harassment based on his race, and (2) the harassment was severe and pervasive enough to alter the conditions of his employment and create a working environment that was objectively and subjectively hostile. *Mason v. Southern Ill. Univ. at Carbondale,* 233 F.3d 1036, 1043 (7th Cir. 2000). Carter's hostile work environment claim falls short on both of those elements.

In evaluating a hostile work environment claim on summary judgment, the court must consider myriad factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). Title VII is not a "general civility code," and it is not intended to remedy complaints attacking "the ordinary tribulations of the workplace, such as sporadic use of abusive language ...." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998); *see also Patton v. Indianapolis Public Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) ("[m]any employees have to put up with some amount of rude, arrogant or boorish behavior at work . . . Title VII does not guarantee a utopian workplace, or even a pleasant one"). Rather, harassment must be racially discriminatory in character or purpose to be actionable under Title VII. *Hardin,* 167 F.3d at 345.

Despite alleging that he was subject to harassment on a daily basis, Carter points to only three specific incidents in support of his racial harassment claim: (1) Gobble's January 2, 2002 radio

transmission, (2) Gobble's assignment of shower duties to Carter's shift on March 5, 2002, and (3) Gobble's allegedly overbearing supervision of Carter's performance.[3]

However, Carter does not point to any facts indicating that the three incidents in question were discriminatory in nature. While Carter need not prove that Gobble's actions were explicitly racist, Carter must, at least, show that Gobble's actions were discriminatory in purpose. Carter has not pointed to any facts that could allow him to fulfill that burden. Gobble's tone of voice in the January 2, 2002 radio incident may have been disrespectful or unprofessional. However, Carter's conclusion that this was a race-based incident is unsupported: the undisputed evidence confirms that Gobble issued his order because of the previous day's deficient performance during Warden Briley's surprise compliance check. Similarly, Carter has not pointed to any facts that would allow a reasonable juror to conclude that Gobble's one-day assignment of shower duties to Carter's shift was a discriminatory act. Although it may have been uncommon for Carter's shift to perform shower duty, it is undisputed that such duties fall within Carter's job description. Moreover, there is no evidence that the allocation of duties between shifts was racially motivated: the undisputed evidence reflects that both shifts included non-white correctional officers and non-white supervisors.

---

[3] Carter attempts to supplement those three incidents of harassment by pointing to other, mostly unrelated, complaints of racial harassment lodged by other IDOC correctional officers. However, the relationship of those complaints to Carter's claim is tenuous. Most of the complaints by other officers did not involve Superintendent Gobble and some of the misconduct alleged in those complaints did not take place at Stateville. In all events, Carter does not point to any facts reflecting that he was the target of those alleged acts of harassment, that he witnessed those incidents or that he even knew of those incidents during the time period at issue. Although potentially relevant on other issues, such evidence is not relevant to the question whether Carter suffered severe and pervasive harassment. *See Johnson v. City of Fort Wayne, Indiana*, 91 F.3d 922, 938 (7th Cir. 1996) (holding that "unsupported conclusions" by other employees of an "atmosphere of bias" are insufficient to support a Title VII claim "[a]bsent specific allegations of discriminatory or harassing conduct *directed at [plaintiff]*") (emphasis added).

Even if Carter could prove that there was a racial element to Gobble's conduct, these three incidents are too isolated and tepid to constitute actionable racial harassment under Title VII. Absent evidence of further specific acts of discrimination directed at Carter, Carter's hostile work environment claim must fail.

Because no reasonable jury could conclude that Carter suffered a racially hostile work environment under Title VII, defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: September 24, 2004